IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBIN NEAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 11-17-SLR |
| | ) | |
| GENESIS PROPERTIES OF DELAWARE, LTD. PARTNERSHIP, L.P., | ) ) ) | |
| | ) | |
| Defendant. | ) | |

Robin Neal, Wilmington, Delaware, pro se

Joseph H. Huston, Jr., Esquire, Larry J. Rappoport, Esquire, and Lisa M. Scidurlo, Esquire of Stevens & Lee, Wilmington, Delaware. Counsel for Defendant.

**MEMORANDUM OPINION**

Dated: June 27, 2012
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Robin Neal ("plaintiff") filed this pro se action against defendant Genesis Properties of Delaware LTD. Partnership, L.P. ("Genesis" or "defendant"), her former employer, on January 6, 2011. (D.I. 2 at 1) Plaintiff alleges religiously-based employment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq., ("Title VII"). As discussed infra p.8, it is unclear the exact basis on which plaintiff proceeds. The court therefore addresses plaintiff's complaint under three different Title VII analyses: (1) hostile work environment; (2) retaliation; and (3) disparate treatment. The court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1331. Currently before the court is defendant's motion for summary judgment. (D.I. 24) For the following reasons, defendant's motion is granted.

## II. BACKGROUND[1]

In October of 1999, plaintiff began working as a housekeeper at Hillside, a long-term care facility owned by defendant, Genesis, and located in Wilmington, Delaware. (D.I. 25 at dep. 11) After working there several years, plaintiff was promoted to a Certified Nurse's Assistant ("CNA"). (Id.) In June of 2007, plaintiff received another promotion to the position of Medical Records Clerk/Supply Coordinator by Hillside Administrator Frank Reimbold ("Reimbold"). (Id. at Ex. Neal-16 at 5)

In January of 2008, plaintiff began seeking information about converting to Islam.

---

[1] Plaintiff has proceeded pro se throughout the instant litigation. Because none of plaintiff's filings set forth a detailed factual recitation, the record for this case is composed mostly of statements from plaintiff's deposition.

(*Id.* at dep. 14) In March of that year, plaintiff underwent Shahadah[2] and completed her conversion to Islam. (*Id.*) After converting, plaintiff began wearing a nikabe (face covering), a khimar (headdress), and an over-garment whenever she left her home, including while working at Hillside. (*Id.* at dep. 16-17)

## A. Plaintiff's Interactions with Scheib

In early August 2008, plaintiff's supervisor, the Hillside Director of Nursing ("DON"), Marie Scheib ("Scheib"), repeatedly made comments to plaintiff about her religious clothing. (*Id.* at dep. 33, 36, 38) The first incident occurred when plaintiff was delivering supplies to nurses on the fourth floor. (*Id.* at dep. 33) As plaintiff exited the elevator, Scheib confronted her saying: "Oh, look at Mother Teresa. Where did you get that bandanna from?" (*Id.*) Plaintiff thought Scheib was referring to her khimar but, despite her anger, said nothing and walked away. (*Id.* at dep. 34-35)

Several days later, while working on the third floor, Scheib again made a comment about plaintiff's khimar, asking her where she got her do-rag from. (*Id.* at dep. 36)

Lastly, a few days after the second incident, as Scheib walked by plaintiff, she said: "Oh, I wish I had a habit so I could run and hide." (*Id.* at dep. 38) Plaintiff did not understand what Scheib was talking about, but her coworkers told her that a "habit" was a name for nun's clothing. (*Id.*)

---

[2] Shahadah is a simple prayer, the recitation of which, in good faith, is all that is necessary to convert to Islam. "The witnessing of the Shahadah both defines a given individual as a Muslim and binds that individual to the observance, in principle, of the other Islamic rights[.]" Peter Samsel, *The Shahadah as Truth and as Way*, 9:2 Sophia: The Journal of Traditional Studies 1, 3-4 (2003).

2

Unrelated to plaintiff's new manner of dressing, but around the time Scheib made the foregoing comments, Reimbold and Scheib met with plaintiff about her lackluster work performance. (*Id.* at dep. 41) During the meeting, plaintiff alleges that Scheib raised her voice and yelled at her "like [she] was one of her children." (*Id.*) Plaintiff further alleges that Reimbold made no effort to calm Scheib or to prevent her from raising her voice to plaintiff. (*Id.* at dep. 42)

### B. Plaintiff's Intra-Company Complaint

Unhappy with the way Scheib was treating her, plaintiff spoke with several members of the Hillside staff and Genesis management in mid-August 2008. (*Id.* at dep 50-63) Plaintiff first approached a Hillside DON, Rhonda Laux ("Laux"). (*Id.* at dep. 40) Plaintiff told Laux about Scheib's comments and asked if she could arrange for plaintiff to speak with someone in management. (*Id.*) Specifically, plaintiff wished to speak with Ida Klinger ("Klinger"), whom she already knew. (*Id.* at dep. 40-41) Shortly thereafter, Klinger visited Hillside and plaintiff told her about Scheib's comments. (*Id.* at dep. 51) Klinger told plaintiff that she would relay her complaint to Betty Scott ("Scott"), another Genesis corporate employee, and that plaintiff could speak with Scott on her next visit to Hillside. (*Id.* at dep. 52)

On August 14, Scott, along with several other corporate employees, visited Hillside to meet with the Hillside managers about various topics. (*Id.* at dep. 52-54) During this visit, plaintiff met with Scott, Reimbold, and another Genesis corporate manager, Bob Lanza, to whom plaintiff reported Scheib's behavior. (*Id.* at dep. 54, 58) Scott asked plaintiff to write a brief statement describing these encounters so that Scott

3

could forward the statement to the human resources department ("HR"). (*Id.* at dep. 58) After receiving plaintiff's written statement, Scott forwarded it to Pam Huenke ("Huenke") in HR. (*Id.* at Ex. Neal-1; *Id.* at Ex. Neal-2)

On August 18, 2008, Huenke sent plaintiff an email to set up a meeting two days later. (*Id.* at Ex. Neal-2) On August 20, 2008, Huenke met with plaintiff in plaintiff's office where they discussed Scheib's behavior. (*Id.* at dep. 60-61) Two days after that meeting, Huenke sent plaintiff another email following up on their meeting. (*Id.* at Ex. Neal-3) In this second email, Huenke told plaintiff that Reimbold had spoken with Scheib about her behavior and instructed plaintiff to contact her (Huenke) immediately if Scheib continued to make inappropriate comments to her. (*Id.*) After this series of meetings and discussions, Scheib ceased making comments to plaintiff about her clothing and plaintiff did not lodge any further complaints. (*Id.* at dep. 65)

### C. Plaintiff's Post-Complaint Grievances

Sometime after these mid-August 2008 meetings, plaintiff complains that Scheib "badgered" her about work related activities on two occasions. (*Id.* at dep. 65) On one occasion, Scheib asked plaintiff to report to the second floor to handle some paperwork. (*Id.* at dep. 63) Twenty minutes later, Scheib again requested that plaintiff report to the second floor. (*Id.*) Once plaintiff arrived on the second floor, she found that Scheib had left her a sticky note detailing the work that she needed done. (*Id.*) After plaintiff had been working on that project for half an hour, Scheib again called plaintiff to give her instructions about what to do when she was finished with her current task. (*Id.*) Lastly, Scheib again paged plaintiff shortly after their third communication. (*Id.* at dep. 64)

4

Plaintiff took this series of interactions to be disrespectful because plaintiff felt that she was capable of doing her job. (*Id.* at dep. 65) Plaintiff also felt that Scheib was being a pest to try and get a rise out of plaintiff. (*Id.* at dep. 65-66)

On one other occasion, plaintiff complains Scheib again badgered her about dealing with intravenous ("IV") equipment at Hillside. (*Id.* at dep. 64) Plaintiff felt that this was unnecessary because the IV equipment in question was the responsibility of the Hillside nursing staff and not the plaintiff. (*Id.*)

### D. Plaintiff's Attendance Problems

In addition to her problems with Scheib, plaintiff also had numerous attendance related issues. (*See generally Id.* at dep. 81-102; *Id.* at Ex. Neal-4) Beginning in July, 2008 and continuing through November, 2008, plaintiff received six "corrective action notices" ("notices"). (*Id.* at Ex. Neal-5, 7, 8, 9) Plaintiff received the first notice on July 17 because she did not follow the proper protocol when calling out sick. (*Id.* at Ex. Neal-9) At this time, plaintiff was reminded of Hillside's remedial policies regarding attendance problems and was directed to consult the employee handbook in order to avoid future problems. (*Id.*; *Id.* at Ex. Neal-10) On October 24, plaintiff received another notice for calling out sick on August 1 and September 17, and for leaving early on September 10, and September 16. (*Id.* at Ex. Neal-8) About a month later, on November 14, plaintiff received another notice for arriving late to work on November 3, 5, and 7. (*Id.* at Ex. Neal-7) Lastly, on November 24, Reimbold issued plaintiff three notices for arriving late on the 11, 12, 13, 14, 18, 19, 20, 21, and the 24 of that month. (*Id.* at Ex. Neal-5) Plaintiff signed the notices, and Reimbold warned plaintiff that she

5

could be fired for her repeated violations of Hillside's attendance policy. (*Id.* at dep. 91-92) However, beyond these written and verbal warnings, plaintiff never received any kind of disciplinary action for her attendance problems. (*Id.* at dep. 105) Despite her well documented attendance problems, plaintiff felt that the three November 24 notices were given to her as retaliation for reporting Scheib. (*Id.* at dep. 89; *Id.* at Ex. Neal-4)

### E. Plaintiff's Leave of Absence and Complaint

Several months later, on January 1, 2009, plaintiff applied for Family Medical Leave so that she could take care of her teenage daughter who had recently given birth. (*See generally Id.* at dep. 111-116; *Id.* at Ex. Neal-11) Plaintiff's request was granted and she went on leave February 9, 2009 with an expected return date of May 6, 2009. (*Id.* at dep. 116) It was during this leave of absence that, on March 25, 2009, plaintiff filed charges with the Delaware Department of Labor ("DDL"). (*Id.* at dep. 118-119; *Id.* at Ex. Neal-12) In the DDL complaint, plaintiff alleged both discrimination based upon her religion and a separate retaliation claim. (*Id.* at Ex. Neal-12) Plaintiff never returned from her leave of absence and her employment at Hillside was terminated on May 21, 2009.[3] (*Id.* at dep. 140; *Id.* at Ex. Neal-14)

On January 6, 2011, almost two years after being terminated, plaintiff filed a complaint against Genesis alleging employment discrimination.[4] (D.I. 2) In the limited space provided on the Title VII form complaint, plaintiff claims that she was subjected to discriminatory conduct with respect to her religion. (*Id.*) Plaintiff specifically complains

---

[3] Plaintiff's termination from Hillside is never raised in either her complaint or her deposition as a basis for this suit.

[4] Plaintiff did not assert a retaliation claim in the complaint filed in this Court.

about Scheib's three comments and the November 24 corrective action notices. (*Id.*)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it

has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Revis v. Slocomb Indus.*, 814 F. Supp. 1209, 1215 (D. Del. 1993) (*quoting Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir. 1987)).

## IV. DISCUSSION

Plaintiff alleges that Genesis is liable for employment discrimination under Title VII because of Scheib's religiously insensitive comments and because Scheib yelled at plaintiff. While not specifically pled, plaintiff appears to allege employment discrimination due to a hostile work environment. Additionally, plaintiff's deposition and original Department of Labor complaint indicate that she is also alleging retaliation in violation of Title VII.

In its motion for summary judgment, defendant does not dispute any of the material facts or assertions set forth in plaintiff's deposition. Defendant argues that, as a matter of law, plaintiff fails to establish a prima face case of either a hostile work environment or retaliation. Specifically, with respect to the hostile work environment claim, defendant asserts that plaintiff has not established: (1) that the discriminatory conduct was severe and pervasive; and (2) that there is a basis for employer liability. Furthermore, defendant argues that plaintiff cannot establish a retaliation claim

because, as a matter of law, plaintiff does not allege any adverse employment action. While not raised by defendant, another possible means of analyzing plaintiffs complaint is as a standard disparate treatment claim premised on religious discrimination.

### A. Hostile Work Environment Claim

#### 1. Title VII standards

Title VII provides, in pertinent part, that it shall be unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e-2.

"In order to establish a claim for employment discrimination due to an intimidating or offensive work environment, a plaintiff must establish, 'by the totality of the circumstances, the existence of a hostile or abusive environment which is severe enough to affect the psychological stability of a minority employee.'" *Aman v. Cort Furniture Rental* Corp., 85 F.3d 1074, 1081 (3d Cir. 1996) (*citing Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990) (*quoting Vance v. Southern Bell Tel. and Tel. Co.*, 863 F.2d 1503, 1510 (11th Cir. 1989))).

To state a Title VII claim premised on a religiously hostile work environment, a plaintiff must demonstrate that: "(1) the employee[] suffered intentional discrimination because of [religion]; (2) the discrimination was pervasive and [severe]; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a person of the same [religion] in that position; and (5) the existence

9

of respondeat superior liability." *Abramson v. William Paterson College of NJ*, 260 F.3d 265, 276-277 (3d Cir. 2001) (*quoting Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293 (3d Cir. 1999) (*citing Andrews*, 895 F.2d at 1482)). If plaintiff fails on an essential element of her claim, then the court need not address the other elements. *See Arasteh v. MBNA America Bank, N.A.*, 146 F. Supp. 2d 476, 493 (D. Del. 2001).

When evaluating the second prong of the analysis, "courts should not consider each incident of harassment in isolation." *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 155 (3d Cir. 1999). Rather, courts must look to the "totality of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it interferes with an employee's work performance." *Eric v. Donsco Inc.*, Civ. No. 1:09-CV-1052, 2010 WL 5018574, at *6 (M.D. Pa. Oct. 12, 2010) (*citing Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). However, the court must always be on guard to "ensure that Title VII does not become a general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

When evaluating the fifth prong of the analysis, "if a plaintiff proves that management-level employees had actual or constructive knowledge about the existence of a . . . hostile environment and failed to take prompt and adequate remedial action, the employer will be liable." *Andrews*, 895 F.2d at 1486. However, a defending employer may shield itself from liability in one of two ways. The first defense has two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably

failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) (alteration to original). Alternatively, if an employer has "an effective grievance procedure–one that is known to the victim and that timely stops the harassment"–then this procedure also "shields the employer from Title VII liability for a hostile environment." *Bouton v. BMW of North America, Inc.*, 29 F.3d 103, 110 (3d Cir. 1994).

### 2. Analysis

Plaintiff complains that she was subjected to employment discrimination by virtue of the hostile work environment that was created by the religiously insensitive comments made by Scheib. Plaintiff is required to demonstrate that the discriminatory conduct that she was subjected to was pervasive and severe. *See Andrews*, 895 F.2d at 1482. Plaintiff has failed to do so.

Plaintiff alleges that her supervisor, Scheib, directed religiously insensitive remarks at her on three occasions. All three comments were made over a period of fourteen days. As soon as plaintiff complained to management about these comments, Scheib ceased to insult plaintiff. The comments in question were in no way physically threatening. Each comment pertained directly to the religious garb that plaintiff had begun wearing after her conversion to Islam. While these comments were insensitive and immature, plaintiff does not allege that they interfered with her ability to perform her work functions.

Plaintiff also alleges that there was an incident where Scheib yelled at her while

11

in Reimbolt's office, and that Reimbolt simply sat by and let it happen. In her deposition and complaint, plaintiff seems to mix this incident in with her other complaints about Scheib's comments. However, plaintiff does not allege any facts that indicate that this incident had anything to do with her religious conversion. Rather, plaintiff admits in her deposition that Scheib was yelling at her about her poor performance in her new role as Medical Records Clerk/Supply Coordinator. Because this yelling incident was not related to any religious discrimination, it should not be taken into account when gauging the pervasiveness and severity of the discriminatory conduct. This leaves only the three comments made by Scheib in a roughly two week window of time.

Even viewing the facts in the light most favorable to plaintiff, the totality of the circumstances is far from pervasive or severe. *See Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2008) (allegedly offensive conduct must be "extreme" and constitute "change in the terms and conditions of employment"). Plaintiff may have been frustrated, angered, or embarrassed by Scheib's comments, but these comments were too infrequent, short-lived, and non-threatening to rise to the level of a Title VII violation. *See Mongelli v. Red Clay Consolidated Sch. Dist. Bd. of Educ.*, 491 F. Supp. 2d 467, 480 (D. Del. 2007) (holding that physical and verbal harassment occurring over a twelve-day period, while humiliating and work disrupting, was too short a period of time to meet the severe and pervasive requirement). In sum, Scheib's three comments about plaintiff's religious clothing "should not be considered severe or pervasive enough to constitute a hostile work environment." *Caver*, 420 F.3d at 263.

Furthermore, even if plaintiff could prove that the discriminatory conduct was severe and pervasive, plaintiff cannot establish employer liability. Scheib is alleged to

have made the religiously offensive statements to plaintiff during the first two weeks of August 2008. Before August 14, plaintiff had already spoken with a supervisor about the incidents. That supervisor had referred her to someone in the Genesis corporate offices with whom plaintiff was able to speak. Then, on August 14, 2008, plaintiff attended a Hillside managers meeting with corporate supervisors from Genesis where plaintiff was given an opportunity to air her grievances. Several days later, by virtue of her meeting on August 14, plaintiff met with a corporate human resources professional. After listening to plaintiff's complaints, the human resources representative saw to it that Scheib was counseled as to proper work behavior and reprimanded for her actions towards plaintiff. In her deposition, plaintiff admits that, after she reported Scheib, no more comments were made to her about her religious clothing or any other offensive matters. In all, the offensive comments were made between August 1 and August 14 and completely ceased shortly after plaintiff's meeting with management.

Plaintiff has made no allegations indicating that defendant is liable for the comments made by Scheib. Plaintiff encountered no trouble in reporting the incidents. Within days of reporting, plaintiff met with four different managers. Most importantly, after plaintiff made her complaint, Scheib never made another religiously charged comment to plaintiff again. These facts indicate that Genesis had an effective procedure for dealing with discrimination, that plaintiff knew of this procedure, and that the system worked to stop harassment in a timely fashion. *Bouton*, 29 F.3d at 110. Even viewing the facts in the light most favorable to plaintiff, defendant is shielded from liability for the religiously insensitive remarks allegedly made by Scheib.

Having found that plaintiff failed to identify a genuine issue of material fact on

13

two essential elements of her prima facie case of hostile work environment, the remaining elements of the claim need not be addressed. *Arasteh*, 146 F. Supp. 2d at 493.

## B. Retaliation Claim

### 1. Title VII standards

With respect to plaintiff's retaliation claim, the anti-retaliation section of Title VII provides in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because she has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation under Title VII, a plaintiff must first prove that: "(1) she engaged in activity protected by Title VII; (2) her employer took an adverse employment action against her; and (3) there is a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340-342 (3d Cir. 2006) (*quoting Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).

"Protected activities" include filing charges of discrimination or complaints about discriminatory employment practices. *See Abramson*, 260 F.3d at 287-88.

As to the second element, the plaintiff must prove that a "tangible, adverse employment action" was taken against her. *Weston v. Pennsylvania*, 251 F.3d 420, 430 (3d Cir. 2001). The Supreme Court has defined such an action as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or

14

a decision causing a significant change in benefits." *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 749 (1998).

### 2. Analysis

In the present case, defendant does not contest that plaintiff engaged in protected activity. Instead, defendant argues that plaintiff cannot demonstrate that any adverse employment action was taken against her. (D.I. 24 at 19)

Plaintiff complains about two occasions where Scheib "badgered" her about work. Although plaintiff may not like being closely supervised at work, Scheib's "badgering" did not amount to any change in employment status. Plaintiff was not fired or demoted, nor was her pay decreased.

Plaintiff also complains that she felt that receiving written reprimands for being consistently late for work was a form of retaliation for reporting Scheib. However, the record shows that plaintiff had a well documented attendance problem. After months of tardiness, plaintiff received six reprimands. Contrary to plaintiff's assertion that these reprimands were a form of retaliation, an examination of the Genesis employee handbook illuminates the great leniency given plaintiff. According to the Genesis employee handbook, plaintiff could have been fired for her repeated tardiness and, yet, her supervisors did not terminate her. Even viewing the facts in the light most favorable to plaintiff, plaintiff has failed to state a prima face case of retaliation under Title VII.

### C. Disparate Treatment Claim

#### 1. Title VII standards

Title VII disparate treatment claims follow the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). (D.I. 54 at 8; D.I. 59 at 9) Under this framework, plaintiff must first establish a prima facie case of discrimination. *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 410 (3rd Cir. 1999); *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318-19 (3rd Cir. 2000). To do this, plaintiff must produce evidence that she: (1) is a member of a protected class; (2) is qualified for her former position; (3) suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of unlawful discrimination, such as when similarly situated non-members of the protected class are treated more favorably than the plaintiff. *Id*; *Mitchell v. Wachovia Corp.*, 556 F. Supp. 2d 336, 347 (D. Del. 2008). With specific respect to elements three and four, and as discussed above, the Supreme Court has defined an adverse employment action as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits." *Burlington Indus. Inc.*, 524 U.S. at 749. Failure to make out a prima facie case will result in a judgment for the defendant. *See Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 352 (3rd Cir. 1999).

#### 2. Analysis

In this case, the facts do not enable plaintiff to establish a prima facie case of discrimination. Specifically, plaintiff does not produce evidence that satisfies elements

three or four of the prima facie case because nothing in the record indicates that plaintiff ever suffered any adverse employment action. During the time that plaintiff complains of discrimination, she was never demoted or reassigned, nor did her pay change. Because no adverse employment action was taken against her, plaintiff's disparate treatment claim fails.

## VI. CONCLUSION

For the reasons discussed above, the court grants defendant's motion for summary judgment and enters judgment in defendant's favor. An appropriate order shall issue.